**Fred HOFFMAN, Respondent,**

v.

**MAYBERRY BROTHERS CONSTRUC-
TION and Allied Insurance Compa-
ny, Appellants.**

No. 20083.

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 3, 1995.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Aug. 16, 1995.

Application to Transfer Denied
Sept. 19, 1995.

Craig S. Johnson, Victor S. Scott, Ander-
eck, Evans, Milne, Peace & Baumhoer, Jef-
ferson City, for appellants.

Glenn R. Gulick, Jr., Hershewe & Gulick,
P.C., Joplin, for respondent.

PARRISH, Judge.

Mayberry Brothers Construction (Mayber-
ry) and Allied Insurance Co. (Allied) appeal a
workers' compensation award to Ethel Hoff-
man, surviving spouse and dependent of
Fred Hoffman, deceased. Mr. Hoffman was
an employee of Mayberry.

The Labor & Industrial Relations Commis-
sion (the Commission) found Mr. Hoffman
died as a result of an injury by accident that
arose out of and in the course and scope of
his employment by Mayberry. Mayberry
and Allied contend the evidence presented
failed to establish that the cause of Mr. Hoff-
man's death was an industrial accident; that
the Commission's award is contrary to the
overwhelming weight of evidence. This
court affirms the award of the Commission.

Evidence presented to the Commis-
sion is considered in the light most favorable
to the award. *Hinton v. National Lock
Corp.*, 879 S.W.2d 713, 716 (Mo.App.1994).
Evidence that would support a different find-
ing is disregarded. *Id.*

Mr. Hoffman was a carpenter employed by
Mayberry. On March 15, 1989, and for sev-
eral weeks before that date, he worked on a
construction project referred to as the Sitton
residence. The residence was a 10,000
square foot structure. It included a swim-
ming pool in a 2,500 square foot enclosure.
The ceiling of the swimming pool enclosure
was constructed of individual redwood
planks. The ceiling was vaulted with its
highest point over the swimming pool.

Scaffolding was erected from the floor of
the swimming pool for purposes of complet-
ing the ceiling. The scaffolding had been in
the swimming pool enclosure for about three
months. It was rented. It was to be picked
up March 15, 1989, the date of the incident
that is the basis of the Commission's award.

During the course of the construction at
the Sitton residence, Mr. Hoffman had

worked on the scaffolding installing the redwood planks on the ceiling. In order to install the redwood planks, he had to hold a plank in one hand and nail it to the overhead structure with a twenty-pound nail gun he held in his other hand.

On March 14, the construction crew began taking down the scaffolding. However, most of it was still standing the morning of March 15. A few boards had to be installed before the remaining scaffolding could be removed.

On the morning of March 15, Mr. Hoffman installed some of the remaining boards on the ceiling. After that, he helped tear down the scaffolding.

Brian Kuehn, one of Mayberry's workers, described how the scaffolding was taken down. He was asked the following questions and gave the following answers.

Q. And in taking down this scaffolding, what did you do?

A. We would be up on the scaffolding handing down the scaffolding planks and then we would take loose the cross-bars and then lift up the scaffolding and hand it down.

Q. Who were you handing it to?

A. Some to Terry, some to Fred [Hoffman] and Charlie and I were up on the scaffolding most of the time, I believe.

Q. And how many pieces had you knocked down that day?

A. Probably about half of them. How many did we have that day?

Q. Do you recall?

A. Several.

Q. —whether you had two to three hundred pieces?

A. I would say that would be close.

.    .    .    .    .

Q. Now, when Fred [Hoffman] and Terry would take the scaffolding and put it in the garage, how far would they have to move it?

A. Depending on where the scaffold was set up, it could be from ten feet to thirty, forty.

Q. And did this go on all morning long?

A. Yes.

.    .    .    .    .

Q. And with reference to the weights of this—this scaffolding, you gave me ranges of anywhere from twenty to some weighing fifty to sixty,—

A. Uh-huh.

Q. —is that correct?

A. Yes.

Mr. Kuehn testified that the work they did the morning of March 15 was different from the type of work they usually did. He was asked if the work necessary to remove the scaffolding was "a lot different, lot harder?" He answered that it was; that "[i]t was tough work."

The workers had taken a 15–minute coffee break during the morning. They took a 45–minute lunch break. After lunch they "started carrying the stuff again." About ten minutes later, Mr. Hoffman complained of a severe headache. Someone told him to sit down. Two or three minutes later Mr. Hoffman began "[s]haking around and kind of slobbering a little and [became] incoherent." He was disoriented and confused; then he lost consciousness.

After a short time, Mr. Hoffman regained consciousness. An ambulance was called and he was taken to a hospital.

Mr. Hoffman had a brain aneurysm. An intracranial catheter was surgically implanted the day he was taken to the hospital. The following day, a craniotomy was performed to repair the aneurysm. He died that evening.

The surgery was performed by Arthur S. Daus, M.D., a neurosurgeon. Dr. Daus testified that the cause of death was a ruptured aneurysm. He described the aneurysm as "a dilated weak spot on an arterial blood vessel in the brain." He compared it to "a weak spot on an inner tube." He explained that some people with aneurysms go through life without experiencing problems. In others, aneurysms rupture. One of the causes for aneurysms rupturing is physical stress, "any sort occurring at work or recreation."

Dr. Daus acknowledged that Mr. Hoffman's aneurysm was not caused by his employment. He stated the opinion, however,

that the work Mr. Hoffman performed the day he was hospitalized produced stress that caused the aneurysm to rupture; that the condition was work-related. He was asked, "[I]s it your opinion with reasonable medical certainty that this patient [Mr. Hoffman], ... had an acute transient hypertensive event caused by that work leading to a rupture of the aneurysm causing his death?" He answered, "Yes."

Another physician, Aly Mohsen, M.D., stated the opinion that Mr. Hoffman's death resulted from the work he did causing the aneurysm to rupture.

A third physician, Dr. Ditmore, a neurosurgeon, testified for Mayberry. Dr. Ditmore gave the opinion that the rupture of the aneurysm was not produced by Mr. Hoffman's work activities.

The Commission found that Mr. Hoffman's death was produced by an accident sustained in the course of employment. It adopted findings of the administrative law judge that relied on the testimony of Dr. Daus.

Mayberry and Allied base their appeal on § 287.495.1(4), RSMo 1994. It provides:

> ... Upon appeal ..., in the absence of fraud, the findings of fact made by the commission within its powers shall be conclusive and binding. The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:
>
> .     .     .     .     .
>
> (4) That there was not sufficient competent evidence in the record to warrant the making of the award.

Mayberry and Allied contend in Point I that the Commission erred in awarding benefits because the evidence "established that the substantial cause of rupture of the aneurysm was the degenerative process of aging." In Point II Mayberry and Allied claim that the Commission's award is contrary to the overwhelming weight of the evidence. The points will be addressed together since both are directed to sufficiency of the evidence.

Requirements for recovery in workers' compensation cases are explained in *Wolfgeh-*er *v. Wagner Cartage Service, Inc.,* 646 S.W.2d 781 (Mo. banc 1983). "To establish a right to compensation, [an] employee must prove both an accident and an injury, *i.e.,* the unexpected event and the resultant trauma." *Id.* at 783.

In *Wolfgeher,* the court held that Missouri would thereafter follow "the overwhelming majority of states" with respect to what constitutes a compensable "unexpected event" or accident. The court held that an unusual or abnormal strain would be compensable regardless of whether it was preceded by a slip or a fall. The court explained, "Where the performance of the usual and customary duties of an employee leads to physical breakdown or a change in pathology, the injury is compensable." *Id.* at 784.

The Commission found the injury that produced Mr. Hoffman's death was the ruptured aneurysm. It found the unexpected event that produced the injury was physical stress that occurred in the course of Mr. Hoffman's lifting and carrying the scaffolding being removed from the Sitton residence project. That finding is supported by the evidence and is consistent with the holding in *Wolfgeher.*

Likewise, the Commission's finding that the rupture of the aneurysm was caused by stress produced by Mr. Hoffman's labor is supported by substantial evidence. The Commission's findings are similar to findings in *Martin v. City of Independence,* 625 S.W.2d 940 (Mo.App.1981). In *Martin* the court held that a ruptured aneurysm was caused by stress an employee experienced from work-related physical labors. The court emphasized that a cardiologist had presented testimony to that effect and that the Commission had relied on that testimony. It acknowledged that it could not substitute its judgment for that of the Commission.

In this case, as in *Martin,* there was sufficient competent evidence to warrant the award. The award is affirmed.

PREWITT, P.J., and SHRUM, J., concur.